IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Robert Steve Jolly, ) | C/A No.: 1:14-4177-TLW-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | |
| Director Bryant Sterling; Warden Edsel ) | |
| T. Taylor; Georgina Ramey, Grievance ) | |
| Coordinator; and Dr. Roland R. Craft, ) | |
| III, MD, F.A.C.S., ) | |
| ) | |
| Defendants. ) | |
| ) | |

Robert Steve Jolly ("Plaintiff"), proceeding pro se and in forma pauperis, filed this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights while incarcerated at MacDougall Correctional Institution ("MCI") in the custody of the South Carolina Department of Corrections ("SCDC"). He sues SCDC Director Bryan Sterling; MCI Warden Edsel T. Taylor; MCI Grievance Coordinator Georgina Ramey ("SCDC Defendants"); and Dr. Roland Craft ("Dr. Craft") (collectively "Defendants") [ECF No. 1].

This matter comes before the court on the following motions: (1) Dr. Craft's motion for partial dismissal [ECF No. 41]; (2) Dr. Craft's motion for summary judgment [ECF No. 42]; and (3) SCDC Defendants' motion for summary judgment [ECF No. 43]. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Plaintiff of the dismissal and summary judgment procedures and the possible consequences if he failed to respond adequately to Defendants' motions. [ECF No. 44].

The motions having been fully briefed [ECF Nos. 46–48], they are ripe for disposition.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), this matter has been assigned to the undersigned for all pretrial proceedings. Having carefully considered the record in this case, the undersigned recommends the district judge grant Defendants' motions.

I.     Factual Background

   A.     Plaintiff's Complaint

Plaintiff claims Dr. Craft performed a right inguinal hernia operation on him on May 20, 2012. [ECF No. 1 at 3]. Plaintiff alleges the surgery was not successful and the swelling never subsided. *Id*. Plaintiff had a second surgery with Dr. Craft on April 15, 2013, although he alleges Dr. Craft did not meet with him prior to the surgery.

Plaintiff states that the officers in charge of transporting him back to MCI forgot to bring a foot stool and he fell climbing into the van. *Id.* at 4. He alleges he that he "was covered in blood from waist to shoes" when he returned to MCI, and was sent to Lieber Correctional Institution ("LCI") to stop bleeding. He returned to MCI the same day and alleges he was placed in general population and had to ask other inmates to help him. *Id*.

At his follow-up appointment on May 9, 2013, Plaintiff informed Dr. Craft that it took 30 minutes to urinate and he was unable to urinate standing up. He alleges his groin was swelling to three times its normal size and he was in severe pain. *Id*. Dr. Craft told Plaintiff he should feel better in 45 days. *Id*. Plaintiff claims Dr. Craft did not prescribe any medication. *Id.* at 5.

Plaintiff claims that he asked Health Care Administrator ("HCA") Harrison for

clarification of his medical problems on May 20, 2013, but Harrison told him Dr. Craft would not respond to multiple inquiries. *Id*. On May 23, 2013, Plaintiff saw Dr. Parker, who ordered an ultrasound and ordered pain medication, but that Plaintiff was not given the pain medication until June 3, 2013. *Id*.

Plaintiff states that on June 6, 2013, he was informed his right testicle had been removed in his second hernia surgery. *Id*. Dr. Craft ordered and Plaintiff received a CT scan in September 2013, after which Dr. Craft informed Plaintiff that he had nerve damage that was not likely to improve with surgery. *Id*. at 6–7. Plaintiff alleges he requested a second opinion, and that as a result, non-medical officers began interfering with his treatment. *Id*. Plaintiff claims the guards tried to stop medical orders that he be provided meals to his dorm and be given ice bags. *Id*. at 7–9. He alleges officers did not take him to medical when it was raining or wet because medical had ordered that he not walk on wet surfaces. *Id*. at 10. As a result, Plaintiff claims he missed all medication when it was wet outside. *Id*.

Plaintiff states that Dr. Byrne put him on medication for urinary problems on October 10, 2013. *Id*. Plaintiff alleges he was treated for his urinary problems with antibiotics beginning in December 2013, but that no one checked to see if the antibiotics worked. *Id*. at 11−12. Plaintiff states that on January 9, 2014, he saw the urologist, who referred him to a surgeon. *Id*. at 12. On February 27, 2014, Plaintiff saw Dr. Wilcox, who informed Plaintiff medical had waited to see if Plaintiff would get better in time, but would now refer him to a chronic pain clinic. *Id*. at 13. However, SCDC denied the referral to the pain clinic. *Id*. at 17. Plaintiff complains that during this time, officers did

3

not honor the pass issued by medical that allowed him to go to the front of the canteen line. *Id*. at 12–16.

B.   Plaintiff's Medical Records

On March 15, 2012, Plaintiff presented to medical with a complaint of pain in his right groin. [ECF No. 43-2 at 33]. He reported a history of an umbilical hernia and renal stones in the past. *Id*. He was referred to the surgical clinic at Kirkland Correctional Institution ("KCI"), where doctors recommended a right inguinal hernia repair due to progressive pain and swelling. *Id*. at 31. Dr. Craft performed the surgery on May 21, 2012, at Palmetto Richland Memorial Hospital. *Id*. Plaintiff returned to MCI the same day.

Dr. Byrne evaluated Plaintiff on May 24, 2012. *Id*. at 29. At that time, he noted significant swelling, as Dr. Craft's notes had warned, but the surgery site looked fine otherwise. *Id*. On June 1, 2012, Nurse Hampton checked the surgical site and noted there was no redness or drainage, but there was a golf-ball sized nodule underlying the surgical site. *Id*. at 28–29. Plaintiff complained of tenderness to the site, difficulty urinating, and that he had to sit down to urinate. *Id*. When Dr. Craft saw Plaintiff on June 7, 2012, Dr. Craft noted that the surgical site looked fine. *Id*.

On June 26, 2012, Plaintiff presented to medical complaining of swelling in his scrotum and discomfort. *Id.* at 28. He relayed that he was having trouble standing, sitting, and walking without discomfort. *Id*. He also reported intermittent stinging at the surgical site. *Id*. On July 5, 2012, Dr. Byrne noted that Plaintiff was doing better and had a well-healed hernia scar. *Id*. at 27. Other than a September 2012 visit to sick call about sporadic

pain from his hernia, Plaintiff did not have further complaints until January 2013.

After evaluations by the nurses in January 2013, Plaintiff was evaluated by a different surgeon, Dr. Rubin, at KCI on January 31, 2013, for an increasing bulge. *Id*. at 24–25. He noted mild tenderness and recommended another surgical repair due to recurrent hernia. *Id*. On March 11, 2013, Nurse Collins-Ridenour noted that Plaintiff was seen in sick call and was requesting to continue his meals on wheels.[1] *Id*. at 23. Plaintiff reported he had been on meals on wheels until the prior day and also requested to be allowed fresh air. *Id*. The nurse noted that they were still waiting on the specialty clinic to schedule the surgery. *Id*. Plaintiff's meals on wheels was extended for one month; however, Nurse Holcomb noted that there was no "fresh air pass" and that medical deferred to security. *Id*.

On March 14, 2013, Plaintiff presented to sick call requesting again that his meals on wheels be reinstated. *Id*. at 22. Nurse Burney noted that he was not able to walk to the cafeteria for every meal, and he was only going when he feared he would not receive a tray or when he was not sent juice, milk, eggs, or something else on his tray. *Id*. Nurse Burney spoke with Dorm Officer Fowler, who told her that Plaintiff's meals on wheels were always delivered, but that it may not contain what he wanted. *Id*. Plaintiff also apparently went to the cafeteria for chicken when chicken was also delivered to his cell. *Id*. Nurse Holcomb ordered that he was to attend meals in the cafeteria, as she had been informed that he was able to ambulate in the yard without difficulty. *Id*. at 23.

---

[1] Meals on wheels are delivered to the dorm, relieving Plaintiff of having to walk to the cafeteria.

Dr. Craft performed Plaintiff's recurrent hernia surgery on April 15, 2013. Plaintiff had signed a hospital consent form, affirming that he recognized that during the course of the operation that unforeseen conditions or complications may necessitate additional or different procedures than those that had been explained him and that he authorized the surgeon to perform those procedures that the surgeon felt in his professional judgment to be necessary. [ECF No. 43-2 at 37]. Dr. Craft's operative report states that the pre-op diagnosis was recurrent incarcerated inguinal hernia. [ECF No. 43-3 at 2]. The post-op diagnosis was recurrent incarcerated inguinal hernia and right hydrocele. *Id*. Dr. Craft performed a repair of the incarcerated hernia with mesh and also a right orchiectomy (removal of the right testicle). *Id*. In the report, Dr. Craft described a large incarcerated sac that was circumferentially dissected off the cord. *Id*. There was a noted hydrocele over the right testicle on the right groin. *Id*. He noted that "there was concern over the viability of the testicle with obliteration of the cord as well as the postoperative recurrence rate is high, given his age, the discomfort and re-operative nature of the groin, we elected to proceed with orchiectomy for prevention of subsequent ischemia, pain, recurrence, etc…" *Id*.

Plaintiff's medical records indicate that he was taken to LCI before returning to MCI because he had blood on his pants. [ECF No. 43-2 at 20]. The records note that upon discharge from LCI, he had a small amount of bright red blood on his dressing, but no active bleeding. *Id*. On April 16, 2013, when the site was rechecked, Plaintiff complained of not being able to sleep well the night before due to pain, but he did not have any more bleeding. *Id*. He reported that other inmates helped him out of bed and to

the bathroom and he felt that this surgery hurt more than the prior time. *Id*. He was given two Tylenol #3 tablets. *Id*. On April 18, 2013, Nurse Holcomb saw Plaintiff and noted that he reported he felt okay, although he was nauseated and his scrotum was very sore and swollen. *Id*. at 18–19. Upon exam, she noted that the scrotum was red/purple and extremely bruised. *Id*. Edema was also present and the entire area was tender to touch. *Id*. He was given Phenergan for nausea and told to keep his scrotum elevated, using a jock strap if available. *Id*.

Plaintiff complained of pain in his scrotum and that one testicle was larger than the other. *Id*. at 15–18. When Dr. Craft saw Plaintiff on May 9, 2013, for surgery follow-up, he found some swelling, which he reassured Plaintiff was to be expected, but no recurrence. *Id*. On May 9, 2013, Nurse Kinney noted that Plaintiff had returned from KCI and claimed he was supposed to receive pain medicine. [ECF No. 43-2 at 15]. Dr. Craft's nurse told her that Dr. Craft did not have any orders for pain medicine, but the doctor could order it if he felt it was warranted. *Id*. Dr. Byrne reviewed the encounter and noted that Plaintiff already had an order for Naproxen and no new pain medications were needed at that time. *Id.*

Dr. Parker evaluated Plaintiff at the specialty clinic on May 23, 2013, and found no recurrence, as there was no erythema and no induration, but he recommended that Plaintiff have pain medicine. *Id*. at 13. Dr. Parker also ordered an ultrasound of the right testicle, which was performed on June 4, 2013. *Id*. The ultrasound showed that there was no right testicle, but there was a fluid collection with multiple septations and variable echotexture throughout the right hemiscrotum. *Id*. at 12. While there was no evidence of

7

a right recurrent inguinal hernia, there was a small left hydrocele on the left. *Id*. On June 6, 2013, Plaintiff reported to Nurse Holcomb that while the radiologist was reading the ultrasound, he stated that a part of the mesh was hitting a nerve in the right inguinal area. *Id*. Nurse Holcomb noted that upon exam there was a hard bulge in the scrotum where the right testicle had been that was movable under the skin. Nurse Holcomb continued the Tylenol #3 for seven days, ordered that his meals should continue to the dorm, and referred Plaintiff to Dr. Parker in the surgery clinic. *Id*. On June 14, 2013, Plaintiff requested Tylenol #3 and refused Motrin. Dr. Byrne denied the request because Tylenol #3 is not appropriate for chronic pain and Plaintiff had an order for Naproxen. *Id*. Nurse Holcomb saw Plaintiff on June 20, 2013, for ongoing complaints of right scrotal and groin pain and requests to have his Tylenol #3 renewed until he saw a surgeon. *Id*. at 10–11. Nurse Holcomb renewed his Tylenol #3 and ordered him ice bags that he could exchange at mealtime. *Id*.

Dr. Craft saw Plaintiff on June 27, 2013, in the surgery clinic. Dr. Craft noted that the right testicle pathology was discussed and the reason for the pain was a cavernous hemangioma. [ECF No. 43-3 at 6]. He agreed with 7-day prescription for Tylenol #3 and ice packs for pain. *Id*. On July 15, 2013, Plaintiff presented to sick call complaining that he had finished his pain medicine and the Naproxen was not helping. [ECF No. 43-2 at 9]. He requested to see an urologist and complained of having to urinate constantly. *Id*. He made the same complaints on August 15, 2013. *Id*. at 8.

Plaintiff saw Dr. Craft on August 8, 2013, for his complaints of pain and intermittent urinary retention. [ECF No. 43-3 at 7]. Because Plaintiff was having pain

8

beyond post-op expectations, Dr. Craft ordered a CT scan of the pelvis. *Id*. Dr. Craft noted that he saw no evidence of nerve entrapment, recurrence, or scrotal complications. *Id*. The CT scan on September 3, 2013, showed a small hypodense ovoid structure in the distal right inguinal canal and upper right scrotum which may represent an infarcted right testicle. [ECF No. 43-2 at 35]. The left testicle had a small hydrocele. *Id*. Plaintiff saw Dr. Craft in the surgery clinic on September 19, 2013. [ECF No. 43-3 at 8]. Dr. Craft noted that Plaintiff's right hemiscrotal swelling had resolved and there was little more that could be offered to him surgically. *Id*. Dr. Craft recommended a BPH prostatitis workup and anti-steroidals. *Id*.

On September 30, 2013, Plaintiff reported swelling to his right groin that was controlled as long as he had access to ice, but he was not provided ice that weekend. [ECF No. 43-2 at 7]. Plaintiff was provided ice that day, and Nurse Holcomb noted that ice could be provided if security and the HCA approved it. *Id*. The nurse noted that a urology consult had been completed. *Id*. at 6. On November 9, 2013, medical informed the cafeteria and the dorm officer that Plaintiff remained on meals on wheels. *Id*. at 5.

On November 13, 2013, Plaintiff requested antibiotics to treat his hydrocele, but the nurse noted that antibiotics do not treat hydroceles. *Id.* In December 2013, Plaintiff saw a urologist, who prescribed Cipro for BPH. *Id*. at 4. Plaintiff went to the urologist on January 9, 2014, who recommended that he return to the surgery clinic for his right hernia pain secondary to CT findings. *Id*. at 3. On February 27, 2014, the surgery clinic referred Plaintiff to the pain clinic, but SCDC disapproved the referral on March 6, 2014. *Id*. at 2.

9

On May 2, 2014, Plaintiff requested to return to the surgery clinic to be seen by Dr. Wilcox. *Id*. at 1. The records indicate a consult was initiated and an appointment was made. *Id*. On May 5, 2014, Nurse Holcomb continued Plaintiff's meals on wheels until his max-out/release date. *Id*.

II.   Discussion

   A.   Dr. Craft's Motion to Dismiss

Dr. Craft's partial motion to dismiss seeks dismissal of any state law negligence claim for medical malpractice against him. [ECF No. 41]. In response, Plaintiff states that his case does not involve a claim for medical malpractice. [ECF No. 46 at 1]. Therefore, to the extent Plaintiff's complaint could be liberally construed to state a claim for medical malpractice, the undersigned recommends such claims be dismissed.

   B.   Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

    C.    Analysis

        1.    Exhaustion of Administrative Remedies

Defendants contend that they are entitled to summary judgment on some of Plaintiff's claims because he has not exhausted his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), specifically 42 U.S.C. § 1997e(a). Section 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are

11

available are exhausted." This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To satisfy this requirement, a plaintiff must avail himself of every level of available administrative review. *See Booth v. Churner*, 532 U.S. 731 (2001). Those remedies neither need to meet federal standards, nor are they required to be plain, speedy, and effective. *Porter*, 534 U.S. at 524.

The purpose of the exhaustion requirement is twofold. First, it gives an administrative agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Woodford*, 548 U.S. 81, 89 (internal citations omitted). Second, "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

The SCDC has a grievance process, whereby an inmate is first required to file an informal request to staff about any issue. Ramey Aff. at ¶7, ECF No. 43-18. He may then file a Step 1 grievance. *Id*. If dissatisfied with the results of his Step 1 grievance, he can then file a Step 2 grievance via the institutional grievance coordinator. *Id*. If the inmate is dissatisfied with the results of his Step 2 grievance, he can then appeal to the South Carolina Administrative Law Court ("ALC"). *Id*. For purpose of exhaustion of administrative remedies so as to pursue a § 1983 claim in federal court, an inmate does not ordinarily need to pursue his administrative remedies past the Step 2 grievance decision. *See Johnson v. Ozmint*, 567 F. Supp. 2d 806, 820, n. 5 (D.S.C. 2008); *Duncan v.*

*Langestein*, No. 07-268, 2008 WL 153975 at *5 (D.S.C. Jan. 14, 2008) (citing *Charles v. Ozmint*, No. 05-2187, 2006 WL 1341267 at *4 n. 4 (D.S.C. May 15, 2006) (recognizing that completion of Step 2 grievance exhausts administrative remedies and § 1997(a) does not require inmates to further appeal to ALC); *Ayre v. Currie*, No. 05-3410, 2007 WL 3232177 at *7 n. 5 (D.S.C. Oct. 31, 2007). Rather, if the prisoner is not satisfied with the response of the Step 2 SCDC official, he may then file a complaint in federal court about the matters raised in his grievance.

Here, Defendants contend that Plaintiff failed to file Step 2 grievances regarding related to the his claims that (1) he was not allowed to walk to medical on wet days and (2) his meals on wheels was suspended. Although Plaintiff argues that his grievances "could be brought back up and made part of the permanent record" [ECF No. 48-1 at 4–5], he does not dispute that he failed to file Step 2 grievances related to these incidents. Therefore, Defendants are entitled to summary judgment related to such allegations.[2]

### 2.     Deliberate Indifference to Plaintiff's Serious Medical Needs

The thrust of Plaintiff's complaint is that Defendants were deliberately indifferent to his serious medical needs. In the case of *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court reviewed the Eighth Amendment prohibition of punishments that "involve the unnecessary and wanton infliction of pain." *Id.* at 103 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169–73 (1976)). The court stated:

---

[2] SCDC Defendants also argue that Plaintiff failed to exhaust his grievances related to his orchiectomy and failure to allow him a canteen pass to bypass the canteen line, as Plaintiff did not appeal these issues to the ALC. However, as discussed above, an appeal to the ALC is not required.

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . We therefore conclude that deliberate indifference to serious medical needs of a prisoner constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Estelle*, 429 U.S. at 103–105 (citations and footnotes omitted). Despite finding that "deliberate indifference to serious medical needs" was unconstitutional, the court was careful to note that "an inadvertent failure to provide adequate medical care" does not meet the standard necessary to allege an Eighth Amendment violation. *Id.* at 105–06.

The Fourth Circuit also considered this issue in the case of *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). In that case, the court noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, . . . nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." *Id.* at 851 (citations omitted). Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Sosebee v. Murphy*, 797 F.2d 179, 182–83 (4th Cir. 1986).

a.     Dr. Craft

With regard to Dr. Craft, Plaintiff appears to disagree with his decision to remove his testicle. However, Dr. Craft provided a medical rationale for his decision that Plaintiff has not disputed with any evidence. Contrary to Plaintiff's argument [ECF No. 47 at 1],

14

Dr. Craft continued to evaluate Plaintiff and provide him treatment to the extent his condition was treatable. While the provision of medical care by prison officials is not discretionary, the type and amount of medical care is discretionary. *See Brown v. Thompson*, 868 F. Supp. 326, 330 n. 2 (S.D. Ga. 1994). The Constitution requires that prisoners be provided with a certain minimum level of medical treatment, but it does not guarantee to a prisoner the treatment of his choice. *Thomas v. Anderson City Jail*, No. 6:10-3270-RMG-KFM, 2011 WL 442053, at *3 (D.S.C. Jan. 19, 2011)*; Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988). The fact that Plaintiff disagrees with the course of his medical treatment is insufficient to establish medical indifference. See *Thomas*, 2011 WL 442053 at *3*; Jackson*, 846 F.2d at 817. Plaintiff has not shown that Dr. Craft's treatment was so grossly incompetent or inadequate as to shock the conscience. Therefore, the undersigned recommends that Dr. Craft be granted summary judgment.

b.     SCDC Defendants

Plaintiff contends that SCDC Defendants interfered with his medical treatment. [ECF No. 48-1 at 8]. Plaintiff alleges in the complaint that Taylor and Ramey either required him to obtain a canteen pass or attempted to revoke his canteen pass on a limited number of occasions. [ECF No. 1 at 12–13]. The evidence Plaintiff cites in support reveals only that he had a medical order that limited his standing, but does not state that he had a canteen pass that allowed him to skip the canteen line. [ECF No. 43-2 at 3]. In fact, in response to his grievance, Ramey informed Plaintiff that medical does not issue passes allowing inmates to go to the front of the canteen line and offered him a wheelchair. [ECF No. 1-1 at 8]. To the extent Plaintiff argues Ramey violated his

15

constitutional rights in responding to his grievances, his claim must fail because he does not have a constitutional right to a grievance policy. *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994). Therefore, the undersigned recommends SCDC Defendants' motion for summary judgment be granted.

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends the following motions be granted: (1) Craft's motion for partial dismissal [ECF No. 41]; (2) Craft's motion for summary judgment [ECF No. 42]; and (3) SCDC Defendants' motion for summary judgment [ECF No. 43].

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

January 21, 2016                                   Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

16

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).